# EXHIBIT 2

INTERROGATORY 8: Identify and describe the internal administrative procedures for addressing complaints and correcting instances of abuse of authority, excessive force, or malicious prosecution by security guards employed CENTRA HEALTH, INC. Respond as follows:

a) State whether the procedures include investigation of complaints and disciplinary consequences.

b) Identify each person responsible for overseeing or initiating the procedures.

c) Identify each person responsible for the ultimate decision on the complaint.

**OBJECTIONS: Centra objects to this Interrogatory on the grounds that it seeks to skirt the limitations on the number of interrogatories as set forth in Rule 33 of the Federal Rules of Civil Procedure by utilizing discrete and distinct subparts. Centra further objects to the characterization of this Interrogatory as a review of matters said to be "abuse of authority, excessive force, malicious prosecution" as Plaintiff is calling for a legal conclusion. Centra objects to this Interrogatory on the grounds it seeks information protected from disclosure based on the attorney client privilege, the work product doctrine, or the attorney work product doctrine. Centra further objects to this Interrogatory on the grounds that any internal administrative processes or procedures for reviewing patient care is confidential and privileged under Virginia Code § 8.01-581.17 and § 8.01-581.16.**

**In pertinent part, Virginia Code § 8.01-581.17(B) provides:**

> **The proceedings, minutes, records, and reports of any (i) medical staff committee, utilization review committee, or other committee, board, group, commission or other entity as specified in § 8.01-581.16...together with all communications, both oral and written, originating in or provided to such committees or entities, are privileged communications which may not be disclosed or obtained by legal discovery proceedings unless a circuit court, after a hearing and for good cause arising from extraordinary circumstances being shown, orders the disclosure of such proceedings, minutes, records, reports, or communications.**

**The scope of the privilege delineated in this section refers to Virginia Code § 8.01-581.16, which encompasses a broad range of actors and actions including:**

> **Every member of, or health care professional consultant to, any committee, board, group, commission or other entity shall be immune from civil liability for any act, decision, omission, or utterance done or**

14

{#2217902-1, 106642-00076-01}

made in performance of his duties while serving as a member of or consultant to such committee, board, group, commission or other entity, which functions primarily to review, evaluate, or make recommendations on (i) the duration of patient stays in health care facilities, (ii) the professional services furnished with respect to the medical, dental, psychological, podiatric, chiropractic, veterinary or optometric necessity for such services, (iii) the purpose of promoting the most efficient use or monitoring the quality of care of available health care facilities and services, or of emergency medical services agencies and services, (iv) the adequacy or quality of professional services, (v) the competency and qualifications for professional staff privileges, (vi) the reasonableness or appropriateness of charges made by or on behalf of health care facilities or (vii) patient safety, including entering into contracts with patient safety organizations, provided that such committee, board, group, commission or other entity has been established pursuant to federal or state law or regulation, the requirements of a national accrediting organization granted authority by the Centers for Medicare and Medicaid Services to assure compliance with Medicare conditions of participation pursuant to § 1865 of Title XVIII of the Social Security Act (42 U.S.C. § 1395bb), or guidelines approved or adopted by a statewide or local association representing health care providers licensed in the Commonwealth pursuant to clause (iii)(f) of subsection B of § 8.01-581.17, or established and duly constituted by one or more public or licensed private hospitals, health systems, community services boards, or behavioral health authorities, or with a governmental agency and provided further that such act, decision, omission, or utterance is not done or made in bad faith or with malicious intent.

Any review of security officers would fall under the purview of committee's organized for the purpose of ensuring patient safety.

**ANSWER:** Centra stands on its objections.


INTERROGATORY 9: Describe in specific detail the events beginning at the time

TERSHAUD SAVORYEA ROSE arrived at Lynchburg General Hospital on February 4, 2016

until he was incarcerated later that evening.

**OBJECTIONS:** Centra objects to this Interrogatory on the grounds it seeks information protected from disclosure based on the attorney client privilege, the work product doctrine, or the attorney work product doctrine. Centra objects to this Interrogatory on the grounds that it cannot provide with "specific detail" all the events that incurred between Rose's arrival at Lynchburg General Hospital on February 4, 2016 until he was incarcerated that

evening. Centra further objects to this request as it is overly broad and unduly burdensome. Centra further objects and refers Plaintiff to the testimony of the Co-Defendants in this case regarding any events that they individually witnessed.

ANSWER: Subject to the foregoing objections and without waiving the same, Centra refers Plaintiff to the medical records which document Rose's arrival to Lynchburg General Hospital and the majority of his interactions with Centra personnel. What follows is a summary and overview of the events on February, 4, 2016. Centra refers Rose to the medical records for the complete recitation of the medical care rendered to Rose in this case.

*Rose's Arrival at Lynchburg General Hospital*

On February 4, 2016, Rose was found lying outdoors at 2323 Memorial Avenue, Lynchburg, Virginia. Rose was found in an altered level of consciousness. He was combative and his words were unable to be understood. 911 was called at approximately 12:49 and an ambulance arrived at approximately 12:59.

The Lynchburg Fire Department crew of Christopher Mabes (CM) (EMT Basic) and Mary Shumate, MS (EMT – Paramedic) arrived at the scene. The Lynchburg Fire Department records document that he had abrasions on both of his elbows, on the tops of his hands, some abrasions with swelling on the back of his head and some small abrasions on his shins. Rose's pupils were noted to be dilated to approximately 7 mm and were reactive. It was noted that Rose could say a few words but it was hard to understand him. In the back of the medical unit Rose was noted to have become combative and agitated. Rose was given a 20 gauge IV lock in his right hand and then given Midazolam (Versed) via IV push. Rose was transported to Lynchburg General Hospital and arrived at approximately 13:25. Rose was noted to be unable to sign the Prehospital Care Report due to being confused/combative.

Rose's care was transferred upon arrival from the Lynchburg Fire Department to Emergency Department nurse Amy Tyree with a verbal report of Rose's prior history given. Nurse Tyree noted in the medical records that Rose had multiple abrasions, including on his hands and elbows.

Michael B. Weigner, M.D. ("Dr. Weigner"), was assigned Rose as an Emergency Department physician. Dr. Weigner's notes reflect that Rose presented with altered mental status. Nurse Amy Tyree noted that "bystanders called EMS for what they believed to be an assault on [Rose']s appearance; EMS states on their arrival, they found patient behind a fence in a secluded area at the plaza in Lynchburg with multiple abrasions and are unsure of the mechanism of those injuries; they state patient was aggressive and combative on scene and were accompanied by LPD officer on arrival to ED." Dr. Weigner noted that "[Rose] was found in a park with decreased responsiveness; there was some unwitnessed

16

concern for an assault; there is also concern expressed that he had taken an overdose; when he was found by paramedics he was combative but not communicating; they were required to sedate him for a safe transport; he arrives obtunded but protecting his airway well; they are unaware of any history surrounding this; police arrive with him also."

Dr. Weigner continued to provide care to Rose. At approximately 15:18, Dr. Weigner noted in the medical records that he spoke to a hospitalist regarding admitting Rose for continued treatment and care. At approximately 15:38, Dr. Weigner noted that several family members had arrived at hospital shortly after Rose. Those family members could not provide any details as to events leading up to Rose coming to the hospital.

At approximately 18:00, Charles H. Coggin, III, M.D., a hospitalist, was brought in to consult on Rose's care. Dr. Coggin's notes document that while Rose stated he just "fell" that it looked like Rose was probably in some sort of altercation. Dr. Coggin noted that Rose's mother and cousins were at Rose's bedside. Dr. Coggin further noted that Rose stated he was homeless. The medical records reflect that Rose was on the drug Abilify for treatment of bipolar/depression but that Rose stated he was not taking his medications. Dr. Coggin documented that Rose did not need to be admitted due to his comorbidities, clinical presentation, and severity of illness. Dr. Coggin noted that the ED physician "is going to work on further disposition, also case management as well; discuss and try to assist the patient with financial help and living situation."

At approximately 18:29, Sarah Austin, a mental health consultant, saw Rose. Rose reported being treated for Bipolar, Schizophrenia, ADHD, and PTSD. Rose "reported losing housing and job when he was incarcerated 8/2015 for assault/battery." Rose further reported "auditory verbal hallucinations of hearing unintelligible whispering and seeing 'black shadows;'" reports problems with mood instability and feeling easily frustrated, agitated and annoyed, with patient reporting "that's not like me I'm usually a happy person." Rose further reported that "I fly into rages for no reason."

*Rose's Elopement from the Emergency Department*
*and Return to the Emergency Department*

At approximately 20:21, Dr. Weigner documented: "At approx. 7 pm the patient was fully awake and had eaten and was back to his baseline; We had psychiatry see him, they felt as if he had no psychiatric concerns at this point; we also have the case manager see him; we were in the final discussions/planning with the hospitalist and the case manager about discharging the patient; I had spoken with his mother Renee; In the middle of this discussion the patient abruptly eloped; He had been calm and cooperative prior to this; eventually he was brought back by the police; He had been [sic] taste in the back; When he came back and he walked in in handcuffs and was calm and [sic] operative for me; He allowed me to reinterview and reexamined him; He was unable to give me a clear

17

{#2217902-1, 106642-00076-01}

reason why he ran except for does say he needed to leave; He has no suicidal or homicidal thoughts; He denies hallucinations; He had a new abrasion on his right shin and he had two tazer marks in his lower back but the prongs were gone; His pupils were midpoint and reactive; He was calm and allowed me to do a full normal neuro exam; His lungs were clear and his abdomen is benign; His cardiac exam was normal; I feel as if he is medically clear; He will be discharged and the police will be taking him into custody; We will discharge him to their care after we cleaned his abrasions."

Warrants were sworn out against Rose and Rose was taken into custody by the Lynchburg Police Department. Rose was incarcerated that evening.





INTERROGATORY 11: Identify and fully describe the reasons for the pursuit, apprehension, detention and arrest of TERSHAUD SAVORYE ROSE on February 4, 2016 and include the following:

a) The circumstances that led any person to believe there was reasonable and articulable suspicion that criminal activity was afoot prior to the pursuit, apprehension, detention and arrest.

18

{#2217902-1, 106642-00076-01}

For each person, provide the specific circumstances that led that person to believe that criminal activity was afoot. If different circumstances led different people to believe that criminal activity was afoot, so state with particularity. Provide the full name, address and telephone number of any person who possessed information that led any person to believe there was reasonable and articulable suspicion to believe that criminal activity was afoot.

        b)     Any other circumstances that led any person to believe that the pursuit, apprehension, detention or arrest was justified. For each person, provide the specific circumstances that led that person to his or her belief. If different circumstances led different people to believe that the pursuit, apprehension, detention or arrest was justified, so state with particularity. Provide the full name, address and telephone number of any person who possessed information that led any employee of CENTRA HEALTH, INC. to believe that the pursuit, apprehension, detention or arrest was justified. State whether or not any officer of the Lynchburg Police Department requested the assistance of any employee or agent of CENTRA HEALTH in pursuing, apprehending, detaining or arresting TERSHAUD SAVORYEA ROSE. If you assert that the pursuit, apprehension, detention and arrest comported with any policies or customs of CENTRA HEALTH, INC., fully describe each such policy or custom.

        c)     The circumstances that led Rudolph Tidwell to believe that he was justified in deploying a TASER electronic weapon against TERSHAUD SAVORYEA ROSE. State whether or not any officer of the Lynchburg Police Department requested that Rudolph Tidwell deploy a TASER electronic weapon against TERSHAUD SAVORYEA ROSE. If you assert that Rudolph Tidwell acted within the policies or customs of CENTRA HEALTH, INC. when he deployed the TASER electronic weapon against TERSHAUD SAVORYE ROSE, fully describe each such policy or custom.

19

{#2217902-1, 106642-00076-01}

d)       The circumstances that led any person to believe there was probable cause to arrest TERSHAUD SAVORYEA ROSE. For each person who was led to believe that probable cause existed to arrest TERSHAUD SAVORYEA ROSE, provide the specific circumstances that led that person to such a belief. If different circumstances led different people to believe that probable cause existed to arrest TERSHAUD SAVORYEA ROSE, so state with particularity.

e)       The particular words or sounds TERSHAUD SAVORYEA ROSE spoke or made from the time he left the patient room at Lynchburg General Hospital on February 4, 2016 and anytime thereafter on that date. If you are unaware or do not remember the particular words or sounds spoken or made, so state and identify the substance of any of his words or sounds to best of your recollection. If you are aware that different people have different recollections of either the particular words or sounds spoken or made by TERSHAUD SAVORYEA ROSE or the substance of the words or sounds he made, so state with particularity.

f)       All details about the manner of effecting the detention, arrest or prosecution of TERSHAUD SAVORYEA ROSE, including (i) the sequence and timing of events, including the specific times or ranges of times that each event took place to the best of your knowledge, (ii) the name, address, telephone number and badge number of each and every person who participated in the detention, arrest or prosecution (ii) the words spoken by each person who participated and (iii) the physical acts of each person who participated.

g)       Whether any person sought criminal charges against TERSHAUD SAVORYEA ROSE and, if so, provide (i) the full name, address, telephone number and badge number of each and every person who sought any criminal charge, (ii) the full name and the Virginia Code section or local ordinance under which each criminal charge was sought, (iii) the identity of the

20

{#2217902-1, 106642-00076-01}

person or persons who sought each particular charge, (iv) the time and place where each

criminal charge was sought.

       h)     A complete description of any communication between any employee or agent of

CENTRA HEALTH, INC. and any other person or persons regarding the decision to charge

TERSHAUD SAVORYEA ROSE with any crime.

**OBJECTIONS: Centra objects to this Interrogatory on the grounds it seeks information protected from disclosure based on the attorney client privilege, the work product doctrine, or the attorney work product doctrine. Centra objects to this Interrogatory on the grounds that it seeks to skirt the limitations on the number of interrogatories as set forth in Rule 33 of the Federal Rules of Civil Procedure by utilizing eight (8) discrete and distinct subparts. Centra further objects that this Interrogatory and its eight (8) subparts are overly broad and unduly burdensome. Centra is a single corporate defendant and Plaintiff is asking that it compile the thought processes of any and all of its employees in answering this Interrogatory.**

**ANSWER: Subject to the foregoing objections and without waiving the same, Rose eloped from the Emergency Department of Centra's Lynchburg General Hospital. Upon his elopement, Rose ran throughout the Hospital until exiting Lynchburg General Hospital's building onto Centra's grounds. Rose then ran throughout Centra's properties. Rose was pursued by Centra personnel because he had an IV lock in his arm and because he had just run throughout the Hospital. This IV lock could have caused physical harm to Rose, an infection, or could have been utilized for drugs. Rose was instructed to return to the Emergency Department in order to have the IV lock removed. Rather than to do, he eloped.**

       **With regard to any of the other named Defendants' thoughts, intentions, or actions in this case, Centra refers Rose to those Defendants.**

INTERROGATORY 12: Fully describe how TERSHAUD SAVORYEA ROSE was injured

during his pursuit, apprehension, detention and arrest.

**OBJECTIONS: Centra objects to this Interrogatory on the grounds it seeks information protected from disclosure based on the attorney client privilege, the work product doctrine, or the attorney work product doctrine. Centra objects to this Interrogatory on the grounds that it calls for a legal conclusion.**

**ANSWER: Subject to the foregoing objections and without waiving the same, before Rose eloped from the Emergency Department, Rose was being treated for altered mental status. He was found to have multiple abrasions including on his hands, fingers/knuckles, elbows**

{#2217902-1, 106642-00076-01}

and shins. He was also noted to have some swelling on his face, and also had a small bruise/swelling to the apex of his scalp.

After Rose eloped from the Emergency Department, he returned with a new abrasion to his shin and he was noted to have been tased in the back with two taser marks to his lower back. Shortly after arriving, Rose was discharged. At the time of discharge, he was alert and oriented, was in no respiratory distress and his vital signs were within normal limits.



INTERROGATORY 14: If an internal investigation was conducted by CENTRA HEALTH, INC. or any other agency regarding the pursuit, apprehension, detention, arrest or prosecution of TERSHAUD SAVORYEA ROSE, identify any reports that were issued or any actions that were taken as a result of the investigation. Include the full name, address, telephone number and badge or identification number (if any) of each and every person who was either a subject of the investigation or who participated in the investigation.

OBJECTIONS: Centra objects to this Interrogatory on the grounds it seeks information protected from disclosure based on the attorney client privilege, the work product doctrine, or the attorney work product doctrine. Centra further objects to this Interrogatory on the grounds that any internal investigations or processes for reviewing patient care are confidential and privileged under Virginia Code § 8.01-581.17 and § 8.01-581.16.

{#2217902-1, 106642-00076-01}

In pertinent part, Virginia Code § 8.01-581.17(B) provides:

> The proceedings, minutes, records, and reports of any (i) medical staff committee, utilization review committee, or other committee, board, group, commission or other entity as specified in § 8.01-581.16...together with all communications, both oral and written, originating in or provided to such committees or entities, are privileged communications which may not be disclosed or obtained by legal discovery proceedings unless a circuit court, after a hearing and for good cause arising from extraordinary circumstances being shown, orders the disclosure of such proceedings, minutes, records, reports, or communications.

The scope of the privilege delineated in this section refers to Virginia Code § 8.01-581.16, which encompasses a broad range of actors and actions including:

> Every member of, or health care professional consultant to, any committee, board, group, commission or other entity shall be immune from civil liability for any act, decision, omission, or utterance done or made in performance of his duties while serving as a member of or consultant to such committee, board, group, commission or other entity, which functions primarily to review, evaluate, or make recommendations on (i) the duration of patient stays in health care facilities, (ii) the professional services furnished with respect to the medical, dental, psychological, podiatric, chiropractic, veterinary or optometric necessity for such services, (iii) the purpose of promoting the most efficient use or monitoring the quality of care of available health care facilities and services, or of emergency medical services agencies and services, (iv) the adequacy or quality of professional services, (v) the competency and qualifications for professional staff privileges, (vi) the reasonableness or appropriateness of charges made by or on behalf of health care facilities or (vii) patient safety, including entering into contracts with patient safety organizations, provided that such committee, board, group, commission or other entity has been established pursuant to federal or state law or regulation, the requirements of a national accrediting organization granted authority by the Centers for Medicare and Medicaid Services to assure compliance with Medicare conditions of participation pursuant to § 1865 of Title XVIII of the Social Security Act (42 U.S.C. § 1395bb), or guidelines approved or adopted by a statewide or local association representing health care providers licensed in the Commonwealth pursuant to clause (iii)(f) of subsection B of § 8.01-581.17, or established and duly constituted by one or more public or licensed private hospitals, health systems, community services boards, or behavioral health authorities, or with a governmental agency and

23

{#2217902-1, 106642-00076-01}

provided further that such act, decision, omission, or utterance is not done or made in bad faith or with malicious intent.

Any review would fall under the purview of committee's organized for the purpose of ensuring patient safety. Centra further objects to the extent that any of this Interrogatory would touch on matters that would be considered privilege under the attorney client privilege or the work product doctrine.

**ANSWER**: Centra stands on its objections.



24

{#2217902-1, 106642-00076-01}



<u>INTERROGATORY 18</u>: If you contend that your security guards acted according to the policies and customs of CENTRA HEALTH, INC. at all times during the pursuit, apprehension, detention or arrest of TERSHAUD SAVORYEA ROSE, fully describe each such policy or custom and state with particularity all facts supporting the contention. If you contend that different security guards acted differently with regard to your policies or customs, so state with particularity.

**<u>OBJECTIONS</u>: Centra objects to this Interrogatory on the grounds it seeks information protected from disclosure based on the attorney client privilege, the work product doctrine, or the attorney work product doctrine. Centra objects to this Interrogatory on**

26

*{#2217902-1, 106642-00076-01}*

the grounds that it seeks to skirt the limitations on the number of interrogatories as set forth in Rule 33 of the Federal Rules of Civil Procedure by utilizing discrete and distinct subparts. Centra further objects to this Interrogatory on the grounds that any policies outlining internal investigations or processes for reviewing patient care are confidential and privileged under Virginia Code § 8.01-581.17 and § 8.01-581.16.

In pertinent part, Virginia Code § 8.01-581.17(B) provides:

> The proceedings, minutes, records, and reports of any (i) medical staff committee, utilization review committee, or other committee, board, group, commission or other entity as specified in § 8.01-581.16...together with all communications, both oral and written, originating in or provided to such committees or entities, are privileged communications which may not be disclosed or obtained by legal discovery proceedings unless a circuit court, after a hearing and for good cause arising from extraordinary circumstances being shown, orders the disclosure of such proceedings, minutes, records, reports, or communications.

The scope of the privilege delineated in this section refers to Virginia Code § 8.01-581.16, which encompasses a broad range of actors and actions including:

> Every member of, or health care professional consultant to, any committee, board, group, commission or other entity shall be immune from civil liability for any act, decision, omission, or utterance done or made in performance of his duties while serving as a member of or consultant to such committee, board, group, commission or other entity, which functions primarily to review, evaluate, or make recommendations on (i) the duration of patient stays in health care facilities, (ii) the professional services furnished with respect to the medical, dental, psychological, podiatric, chiropractic, veterinary or optometric necessity for such services, (iii) the purpose of promoting the most efficient use or monitoring the quality of care of available health care facilities and services, or of emergency medical services agencies and services, (iv) the adequacy or quality of professional services, (v) the competency and qualifications for professional staff privileges, (vi) the reasonableness or appropriateness of charges made by or on behalf of health care facilities or (vii) patient safety, including entering into contracts with patient safety organizations, provided that such committee, board, group, commission or other entity has been established pursuant to federal or state law or regulation, the requirements of a national accrediting organization granted authority by the Centers for Medicare and Medicaid Services to assure compliance with Medicare conditions of participation pursuant to § 1865 of Title XVIII of the Social Security Act (42 U.S.C. § 1395bb), or guidelines approved or adopted by a statewide or local

27

{#2217902-1, 106642-00076-01}

association representing health care providers licensed in the Commonwealth pursuant to clause (iii)(f) of subsection B of § 8.01-581.17, or established and duly constituted by one or more public or licensed private hospitals, health systems, community services boards, or behavioral health authorities, or with a governmental agency and provided further that such act, decision, omission, or utterance is not done or made in bad faith or with malicious intent.

**ANSWER:** Centra stands on its objections.



28

{#2217902-1, 106642-00076-01}